UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 21-60124-CR-SMITH

**UNITED STATES OF AMERICA**

v.

**MARK LOUIS VOLLARO,**

       **Defendant.**

_____/

## FACTUAL PROFFER

The United States of America and MARK LOUIS VOLLARO (hereinafter the "defendant") agree that if this case had gone to trial, the government would have proven beyond a reasonable doubt the following facts, which occurred in the Southern District of Florida:

1. USA Healthcare Inc. (hereinafter referred to as "USA Healthcare") was incorporated under the laws of the State of Florida on February 25, 2014, and maintained an office in Boca Raton, Florida. USA Healthcare was a "call center" – a company created to "cold call" individuals to solicit business. Three co-conspirators founded USA Healthcare.

2. Complete Healthcare Concierge Inc. (hereinafter referred to as "CHC") was a Florida corporation with an address in Boynton Beach, Florida. CHC was incorporated in or around June of 2013. The defendant was the chief executive officer and the registered agent for CHC. CHC purportedly provided "telemedicine" services through a team of doctors, nurses, and triage personnel which would consult with referred patients and provide prescriptions for compounded medications. The defendant was the sole signatory on CHC bank account held at Citibank.

3. RX Connections, LLC (hereinafter referred to as "RX Connections") was a Florida

Limited Liability Company located in Deerfield Beach, Florida. The LLC was registered in or around January of 2015. RX Connections claimed that it provided marketing services, however, it also laundered funds for defendants associated with CHC, including the defendant. Co-defendants James Engimann ("Engimann"), Benjamin Heath ("Heath"), and Christopher Margait ("Margait") were all affiliated with RX Connections. Initially, the defendant was also a signatory on the RX Connections bank account held at Citibank.

4. The defendant and co-defendant Jason Todd Faley ("Faley"), who was the chief financial officer at CHC, were initially the primary participants in CHC. In early 2015. Margaret Anne Chiasson ("Chiasson"), Joseph Anthony Cavallo ("Cavallo"), and Anthon Joseph Loveland ("Loveland") all left USA Healthcare in order to join the defendant and Faley at CHC.

5. In late 2014, the co-conspirators at USA Healthcare reached an agreement with the defendant and his co-defendant Faley at Complete Healthcare Concierge ("CHC"). The co-conspirators at USA Healthcare agreed to pay the defendant and Faley for telemedicine consults, and further agreed to pay the defendant and Faley an additional ten percent of any money USA Healthcare received for prescriptions for compounded medications that successfully adjudicated.

6. According to cooperating defendant #1, shortly after they opened USA Healthcare, he was approached by the defendant. Cooperating defendant #1 would testify that the defendant told him and another co-conspirator that he had a team of doctors, nurses, and triage personnel where patients could obtain prescriptions with a telephone consult. The defendant advised cooperating defendant #1 to focus on compounded medications and that he (the defendant) could get 98% of the prescriptions brought to him filled. Cooperating defendant #1 would testify that the defendant told him that CHC would charge $90 to $95 for each consult. Cooperating defendant #1 met the next day with the defendant and co-defendant Faley at a lunch to discuss the deal. The

defendant told cooperating defendant #1 he (the defendant) would receive 10% on the "back-end" once the compounded prescription was adjudicated by the pharmacy. Cooperating defendant #1 would testify that he asked the defendant about the legality of the deal, and the defendant told cooperating defendant #1 that he (the defendant) was "lawyered up."

7. The following day the defendant met with a group of co-defendants, including co-defendant Loveland and discussed the scheme. When one of them questioned how he (the defendant) could get such a high percentage of prescriptions filled, he told them not to worry. Cooperating defendant #1 would further state that he and other co-conspirators, including Loveland worked out an agreement whereby they were paid 30% to 40% of the prescriptions they referred once they were adjudicated.

8. Cooperating defendant #1 would state that initially the scheme worked, and they were making money. However, the members of USA Healthcare began to get calls from patients reporting that they received prescription medications but had not spoken with a physician. According to cooperating defendant #1, he passed the information to the defendant several times, and the defendant responded he would handle it.

9. Cooperating defendant #1 would further state that he discussed with the defendant and co-defendant Faley the requirement for a video between the patient and doctor, and they were shown the regulation. Eventually a cease-and-desist letter was sent to the defendant and CHC because of the number of patients who had contacted USA Healthcare complaining that they had received medication from a doctor that they did not know and complaining that they had not spoken with a doctor.

10. Bank records have confirmed that CHC received tens of thousands of dollars from USA Healthcare. Cooperating defendant #1 was also able to produce a prescription, and a log,

which contained notations indicating that the defendant's organization was to receive a back-end payment of 10%. Cooperating defendant #1's statements regarding payments to CHC for telemedicine services are confirmed by a series of 10 wire transfers between September of 2014 and January of 2015. The wire transfers, all authorized by another cooperator, totaled $158,128. One of the wires was sent CHC's bank account to the defendant's attention.

11. Interviews with cooperating defendant #2 confirm cooperating defendant #1's statements. Cooperating defendant #2 also confirmed cooperating defendant #1's statements about patients not talking to a doctor. Cooperating defendant #2 also stated that the defendant and CHC expanded, had established a call center to solicit patients, were doing the telemedicine, and were working with the pharmacies. Cooperating defendant #2 produced text messages wherein they are discussing the codes used to track the prescriptions so that they knew how much they were supposed to be paid. According to cooperating defendant #2, he had renegotiated the amount paid for each consultation to $60 from $90, because the defendant was receiving a 10% kickback on all the prescriptions once they were paid. Cooperating defendant #2 confirmed the presence of the other co-conspirators at the meetings including Loveland, Garcia, Chiasson, and Faley. Cooperating defendant #2 was also able to produce bank statements regarding the wire transfers (later confirmed by records produced pursuant to a subpoena) and various text messages between the co-conspirators regarding the scheme.

12. Bank records were obtained that establish that the defendant had accepted checks from USA Healthcare made out to him personally. According to cooperating defendants #1 and #2, these checks -- which were smaller than the wire transfers – are the payments that they made to the defendant to fulfill their agreement that he would get 10% percent of the adjudicated amount for the prescriptions that he processed. Although some of the checks state "pay" on the memo line

– these were actually the defendant's commission payments. This was confirmed by cooperating defendant Garcia, who signed the checks. Garcia stated that if the check stated commission – it was the defendant's share of a kickback.

13. Cooperating defendant #3 (co-owner of NuMed pharmacy), also stated that the defendant and several of the co-defendants, including Chiasson, Faley, and Engimann reached an agreement with he and his co-defendants that would pay the defendant and his associates at CHC 40% kickback on the compounded medications that CHC physicians signed off on, submitted to their network of pharmacies, that were paid for by the insurance companies. Cooperating defendant #3 also stated that the defendant and CHC could not receive moneys directly from the pharmacies because it was illegal and a kickback, so the pharmacy would pay NuMed Care and they would funnel the payments through to the defendant and CHC through RX Connections. Cooperating defendant #3 was able to provide an email that confirms that CHC was providing telemedicine services for prescriptions processed at NuMed Pharmacy.

14. Bank records confirm that there were payments from RX Connections to CHC. Analysis has confirmed nine wires for $75,000 from NuMed into RX Connections and wires out to CHC totaling approximately $91,000.

15. Cooperating defendant #4 (also affiliated NuMed) confirmed cooperating defendant #3's statements about the defendant and CHC. According to the cooperating defendant #4, he struck several deals with the defendant and Faley. He met with and agreed to pay the defendant and Faley 40% of the prescriptions that they were generating through their marketers that were sent to NuMed pharmacies. According to cooperating defendant #4, Faley and the defendant were adamant that they could not receive the monies directly, and instead requested that the money be sent through companies set up by Chiasson (Clinical Solutions) and Engimann (RX

Connections). Cooperating defendant #4 stated that he paid them by checks and wire transfers from NuMed accounts as well his LLC, Vizionary Marketing. According to cooperating defendant #4, they met often – every Friday – and would discuss how much was owed. The meetings primarily consisted of cooperating defendant #3 and #4, and co-defendants Faley, Engimann and initially Chiasson. According to cooperating defendant #4, they discussed changing the ingredients in the various compounded medications to get the maximum benefit. Cooperating defendant #4 was able to produce two checks - one to RX Connections for $30,000 (Engimann), and one to Clinical Solutions (Chiasson). Another check from his company, Vizionary Marketing, for $16,000 was cashed by the defendant. A review of Cooperating defendant #4's records of the system they had created to track the prescriptions, revealed that NuMed had generated over $5,000,000 in adjudicated prescriptions, and the defendant and CHC received approximately $2,200,000 as their 40% kickback.

16. Cooperating defendant #4 also stated that NuMed had a deal with CHC to provide telemedicine services. According to cooperating defendant #4, all the prescriptions would be approved. NuMed marketers would have to pay the $90 consultation. Cooperating defendant #4 was getting 10% of the paid prescriptions for connecting the marketers with CHC.

17. Cooperating defendant #5 was also involved in a scheme with the defendant. Called the "Clinical Care Coordinator" was a way to pay the doctors extra money without it making it appear that they were paid for the individual prescriptions. According to cooperating defendant #5, the scheme was designed to hide that the prescriptions were not medically necessary.

18. One of the doctors who worked for CHC, is cooperating defendant #6. Cooperating defendant #6 stated that he had received pre-populated prescriptions and he just signed them. He claimed that he believed that CHC was conducting "triage" with another medical professional

before the patients were sent to him. He admitted that he didn't talk to many patients. He admitted to being paid $20 per prescription he signed. He knew the defendant's telephone number, and he did discuss payments with him. CHC did fire cooperating defendant #6 for writing prescriptions without talking to the patients in a letter signed by the defendant. However, according to a review conducted by the agents, CHC continued to use cooperating defendant #6's name on prescriptions. According to the letter, cooperating defendant #6 was fired on November 23, 2015. Between December 1, 2015 and March 23, 2016, CHC submitted claims based on 798 prescriptions purportedly signed by cooperating defendant #6, which paid $8,964,539. Cooperating defendant #6 would testify that he did not sign prescriptions for CHC after he was fired.

19. Payments were made from various insurance providers including Tricare, a federal health care benefit plan. The payments to the pharmacies were processed by a pharmacy benefit management company on behalf of the various insurance providers. The pharmacy benefit management companies that processed the payments on behalf of the insurance providers were located outside the state of Florida, and all payments for the prescriptions were processed through the wires that crossed state lines.

20. As the CEO OF CHC, the defendant and his co-conspirators had agreements with pharmacies and others to receive remuneration in return for referring an individual to a person for the furnishing, or arranging for the furnishing, of any item or service for which payment may be made in whole or in part by the pharmacy benefit management companies on behalf of insurance providers, including private insurers and federal health benefit programs. The prescriptions that were used to obtain the payments from the insurance providers were for compounded medications that were not medically necessary. The defendant and his co-defendants did knowingly and willfully solicit and receive renumeration, including kickbacks and other payments in return for

referring individuals to a person for the furnishing or the arranging of furnishing of any item and service for which payment was made by the pharmacy benefit management companies on behalf of insurance providers, including private insurers and federal health benefit programs.

Accordingly, with respect to Count 2 of the superseding indictment, charging the defendant with conspiracy to commit wire fraud, the government has provided sufficient facts to prove beyond a reasonable doubt that: 1) that two or more persons in some way or manner came to a mutual understanding to try to accomplish a common and unlawful plan to commit wire fraud; and 2) that the defendant, knowing the unlawful nature of the plan, and with intent to defraud, joined in it, in violation of 18 U.S.C. §1349.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

Date: 2/11/2022        By: _____
                            CYNTHIA R. WOOD
                            ASSISTANT UNITED STATES ATTORNEY

Date: 2/11/2022        By: _____
                            BERNARD M. CASSIDY
                            ATTORNEY FOR THE DEFENDANT

Date: 2/11/2022        By: _____
                            MARK LOUIS VOLLARO
                            DEFENDANT

8